UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                        )
PUBLIC SERVICE MUTUAL                   )
INSURANCE COMPANY,                      )
        Plaintiff,                      )
                                        )
v.                                      )
                                        )        **C.A. No. 09-cv-11872-DJC**
CAPE COD DISTRIBUTORS, INC.,            )
JEAN PAUL ARTEAGA, DONUT II             )
REALTY, LLC, MCCARTHY                   )
MANAGEMENT CO., INC., and               )
DUNKIN' DONUTS CORP.                    )
        Defendants.                     )
_____)

## DEFENDANT CAPE COD DISTRIBUTORS' OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM IN SUPPORT OF DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT[1]

## INTRODUCTION

Plaintiff Public Service Mutual Insurance Company ("Plaintiff" or "PSM") has moved

for summary judgment on its claim for declaratory relief, and claims that it has no obligation

to defend or indemnify Defendant Cape Cod Distributors, Inc. ("Defendant" or "CCD"), or

any additional insured parties pursuant to the liability policies it issued CCD.

PSM must defend and indemnify CCD and the additional insureds – Donut II Realty,

LLC, Dunkin' Brands,[2] and McCarthy Management Co. – because the language of the policy,

the express and unequivocal intention of the parties in obtaining these policies, and

controlling case law require that PSM provide coverage as a matter of law.  The primary

policy itself expressly provides coverage for "bodily injury . . . caused by an accident."

Through its lease and franchise agreement, CCD assumed liability for any claim made for

_____
[1]      Defendant Cape Cod Distributors, Inc.,  filed its Motion for Leave to File Excess Pages [Docket No. 46] on March 30, 2011, and submits this brief pending the Court's ruling on that motion.

[2]      Dunkin' Brands is named in the Complaint as "Dunkin' Donuts Corp.," but Dunkin' Brands is the proper party name.

such an injury against its landlord, Donut II, and its franchisor, Dunkin Brands, and PSM, pursuant to the "insured contract" provision, agreed to cover such potential liability in the event a person (such as a CCD employee, an independent contractor, or third-party guest) sustains bodily injury on the premises and sues Donut II or Dunkin' Brands, as has occurred here.

The coverage exclusions that PSM relies on do not apply and do not limit PSM's affirmative obligation to provide insurance sufficient to cover CCD's "insured contracts." PSM's attempt to shirk its insurance obligations when faced with a catastrophic claim is improper, inconsistent with the plain language of the policies, the intent of the parties, and controlling case law, and constitutes bad faith insurance practices. Accordingly, this Court should deny PSM's motion for summary judgment and grant CCD's cross-motion for summary judgment.

## STATEMENT OF MATERIAL FACTS

1.      John Paul Arteaga ("Mr. Arteaga") sustained catastrophic injuries in an accident when he fell from the roof at 17 Kendrick Road, Wareham, Massachusetts ("the Premises") on December 4, 2007. (Affidavit of Jose S. Couto ¶¶ 3-4 ("Couto Aff."), attached as Exhibit 1 to Affidavit of James Kossuth, Esq. ("Kossuth Aff.") ¶ 3).

2.      At the time, Mr. Arteaga was working as the production manager for CCD. His duties included baking products for sale in Dunkin' Donuts stores. (Couto Aff. ¶ 6; Affidavit of Stephen J. McCarthy ¶ 10 ("McCarthy Aff."), attached as Exhibit 2 to Kossuth Aff. ¶ 4).

3.      CCD paid Mr. Arteaga workers' compensation benefits pursuant to CCD's separate workers' compensation insurance policy. (Couto Aff. ¶ 5).

2

4. On or about August 26, 2009, Mr. Arteaga filed a "complaint for discovery" in Plymouth Superior Court, PLCV2009-01064 ("First Lawsuit"). (PSM Ex. 1).

5. The First Lawsuit named CCD, Donut II Realty LLC ("Donut II"), Dunkin' Brands, named in the complaint as "Dunkin' Donuts Corp." ("Dunkin' Brands"), and McCarthy Management Co. ("McCarthy Management"), among others, as defendants. (PSM Ex. 1).

6. CCD, Donut II, Dunkin' Brands and McCarthy Management made demand for insurance coverage to PSM pursuant to their rights under the Primary and Umbrella policies. However, PSM denied that it has any obligation to defend or indemnify any of them. (Letter from John A. Donovan III to CCD (Aug. 5, 2008), attached as Exhibit 3 to Kossuth Aff. ¶ 5; Letter from John A. Donovan III to Donut II (Aug. 26, 2009), attached as Exhibit 4 to Kossuth Aff. ¶ 6; Letter from John A. Donovan III to CCD (Oct. 30, 2009), attached as Exhibit 5 to Kossuth Aff. ¶ 7).

7. On February 9, 2010, the Superior Court dismissed the First Lawsuit as to all defendants, but did allow Mr. Arteaga to inspect the premises and have his deposition taken to preserve his testimony. (PSM Ex. 6).

8. On December 6, 2010, Mr. Arteaga filed a new lawsuit in Plymouth Superior Court, PLCV2010-1575 ("Second Lawsuit"), naming Donut II, Dunkin' Brands, McCarthy Management, among others, but not CCD, as defendants. (PSM Ex. 2).

9. Among the claims asserted in the Second Lawsuit, Mr. Arteaga alleges that, among other things, one or more of Donut II, Dunkin' Brands, or McCarthy Management negligently failed to warn of hazards, negligently failed to train its employees, or negligently failed to inspect the premises. (*See, e.g.*, PSM Ex. 2 ¶ 89 (allegations against Donut II); *id*.

¶ 107 (same allegations against Dunkin' Brands); *id*. ¶ 113 (same allegations against McCarthy Management)).

10. As production manager for CCD, Mr. Arteaga was not trained, instructed, or otherwise authorized to climb to the roof to examine or repair equipment, or for any reason. (Couto Aff. ¶ 7; *see also* McCarthy Aff. ¶¶ 14-15).

11. It was not in the scope of Mr. Arteaga's duties to climb to the roof for any reason. (Couto Aff. ¶ 7; *see also* McCarthy Aff. ¶¶ 14-15).

12. In the event of a ventilation problem, Mr. Arteaga's duty was to call a repair company to inspect and repair the problem. (Couto Aff. ¶ 8; McCarthy Aff. ¶ 14).

13. On December 4, 2007, Mr. Arteaga noticed that there was an odor of gas coming from one piece of kitchen equipment, and that another was smoky, indicating a problem with roof ventilation equipment. (Couto Aff. ¶ 9).

14. Mr. Arteaga called Café Repair Services to inspect and repair the gas leak and ventilation system. (Couto Aff. ¶ 10).

15. Mr. Arteaga accompanied the repairman to the roof, despite having no training or authority to do so. (Couto Aff. ¶ 11).

16. After the repairman examined the ventilation problem and determined that it was too dark to fix at that time, Mr. Arteaga noticed another, unrelated, vent on the roof that appeared to him to be improperly aligned. (Couto Aff. ¶ 12).

17. Mr. Arteaga proceeded to attempt to re-align that vent and stepped off the edge and fell to the ground, sustaining injuries. (Couto Aff. ¶ 13).

18. At the time of the accident, CCD had a lease agreement ("the Lease") whereby it leased the Premises from the owner Donut II. (Couto Aff. ¶ 14).

19. The Lease required that CCD obtain

> an insurance policy or policies protecting the Lessee [CCD] and the Lessor [Donut II] and their directors and employees against any loss, liability or expense whatsoever from (without limitation) fire, personal injury, theft, death, property damage or otherwise arising or occurring upon or in connection with the Premises or by reason of the Lessee's [CCD] operation or occupancy of the Premises. Such policy or policies shall include comprehensive general liability insurance, including, but not limited to, product and contractual liability coverages, with a single limit of Five Million Dollars ($5,000,000.00) for bodily injury and property damage combined, all risk property damage insurance, including flood and earthquake protection, for the full replacement cost value of the Premises, plate glass insurance and boiler insurance as may be required in the Commonwealth of Massachusetts.

("Lease of Dunkin' Donuts Kitchen Facility," between Donut II and CCD § 12(c) (Aug. 15, 2002), attached as Exhibit 6 to Kossuth Aff. ¶ 8).

20. The Lease also required that "All insurance afforded by the policies required under the terms of this Paragraph shall . . . [b]e written in the names of the Lessee, the Lessor and any other party directed by the Lessor, as their respective interests may appear." (Lease § 12(c)(1)).

21. Pursuant to the terms of the Lease, CCD obtained the Primary Policy and Umbrella Policy to provide the agreed-upon insurance coverage to Donut II and McCarthy Management, which are named as additional insureds on both policies. (Couto Aff. ¶ 15).

22. At the time of the accident, CCD had a franchise agreement ("the Franchise Agreement") with Dunkin' Brands. (Couto Aff. ¶ 16).

23. The Franchise Agreement required that CCD obtain

> an insurance policy or policies protecting FRANCHISEE [CCD] and DUNKIN' DONUTS, and their directors and employees against any loss, liability or expense whatsoever from, without limitation, fire, personal injury, theft, death, property damage or otherwise arising or occurring upon or in connection with the CPL [the leased premises] or by reason of FRANCHISEE's [CCD] operation or occupancy of the CPL. Such policy or policies shall include comprehensive general liability insurance, including but not limited to, product, contractual, and owned and non-owned vehicle liability coverages, with a single limit of One Million Dollars ($1,000,000.00) (or such higher limit as DUNKIN' DONUTS, in its sole and absolute discretion, may

5

> from time to time require, and as may be required under the terms of any lease for the CPL) for bodily injury and property damage combined, "All Risk" property damage insurance, including without limitation flood and earthquake protection, for the full replacement cost value of the CPL and the contents thereof, plate glass insurance and boiler insurance, if applicable, and such statutory insurance as may be required in the state in which the CPL is located.

("Dunkin' Donuts Franchise Agreement for a Co-operative Production Location ("CPL")," between Dunkin' Donuts, Inc., and CCD § 5.3 (Apr. 25, 2003), attached as <u>Exhibit 7</u> to Kossuth Aff. ¶ 9).

24.     At the time of the December 4, 2007 incident and in accordance with the Lease and the Franchise Agreement, CCD had obtained and had in effect the following liability insurance policies from PSM:  a Future Builder Business Owners Policy, policy number BF 017987 (the "Primary Policy") and the Commercial Umbrella Liability Policy, policy number UM 006335 (the "Umbrella Policy").  (Couto Aff. ¶¶ 15, 17; PSM Ex. 4; PSM Ex. 5).

25.     Under the Primary Policy, PSM agreed to "pay any amounts up to your [CCD's] Limit of Coverage for which you or anyone else covered under your *Liability Coverages* becomes liable as a result of 'bodily injury' . . . that is caused by an accident." (PSM Ex. 4 at 39).

26.     Under the Primary Policy, CCD's "Limit of Coverage for each accident is $1,000,000." (PSM Ex. 4 at 2).

27.     Under the Primary Policy, PSM agreed to "cover liability assumed in a contract or agreement that is an 'insured contract.'" (PSM Ex. 4 at 41).

28.     The Primary Policy defined "insured contract" to include "a lease of premises" and "that part of any other contract or agreement pertaining to your [CCD's] business under which you assume the tort liability of another to pay damages because of 'bodily injury' . . . to a third person or organization, if the contract or agreement is made prior to the 'bodily injury' . . . . Tort liability means a liability that would be imposed by law in the absence of any contract or agreement." (PSM Ex. 4 at 42).

6

29.     The coverage provided by the insured contract provision was required by the Lease and the Franchise Agreement, and CCD intentionally purchased the Primary Policy to provide this coverage.  (Couto Aff. ¶¶ 15, 17, 18).

30.     The Primary Policy named Donut II, Dunkin' Brands, and McCarthy Management as additional insureds, pursuant to endorsement FB3407, "Liability Coverage for Additional Persons and Organizations."  (PSM Ex. 4 at 7 (specifically naming those parties and showing the premiums paid); Ex. 4 at 64 (Endorsement FB3407, providing coverage)).

31.     The Primary Policy named Dunkin' Brands as an additional insured, pursuant to endorsement FB3590, "Additional Coverage for Grantor of Franchise."  (PSM Ex. 4 at 6 (specifically naming Dunkin' Brands and showing the premium paid); Ex. 4 at 65 (Endorsement FB3590, providing coverage)).

32.     Under the Umbrella Policy, PSM "will pay on behalf of the insured the ultimate net loss for occurrences during the policy period in excess of the underlying insurance or for occurrences covered by this policy which are either excluded or not covered by underlying insurance because of Personal Injury . . . ."  (PSM Ex. 5 at 8).

33.     The "Limit of Liability" under the Umbrella Policy is "$4,000,000 as the result of any one occurrence on account of personal injury, property damage or advertising offense, or any combination thereof."  (PSM Ex. 5 at 2).

34.     The Umbrella Policy defines "insured" to include "[a]ny . . . organization . . . with respect to which you [CCD] are obligated by virtue of a written contract to provide insurance such as is afforded by this policy, but only with respect to operations by or on behalf of, or to facilities of, or used by you."  (PSM Ex. 5 at 9).

## ARGUMENT

### I.  SUMMARY JUDGMENT STANDARD

Summary judgment is proper when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2); *see Foley v. Town of Randolph*, 598 F.3d 1, 5 (1st Cir. 2010).  A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining summary judgment motions, the court must view the facts in the light most favorable to the party opposing the motion.  *See Scott v. Harris*, 550 U.S. 372, 378 (2007).  The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  PSM has neither established that it is entitled to judgment as a matter of law, nor, alternatively, has it established that there exists no genuine dispute as to the material fact of the scope of Mr. Arteaga's duties.  This Court should therefore deny PSM's motion.  Furthermore, for the reasons stated in CCD's cross-motion for summary judgment and below, this Court should grant CCD's cross-motion.

### II.  INTERPRETATION OF INSURANCE POLICIES

PSM overlooks some basic tenets of insurance policy construction and interpretation, and attempts to portray the policy as not requiring PSM to provide any coverage to CCD or the additional insureds.  When interpreting and construing the terms of this liability policy, the Court must keep in mind several black-letter rules which, in conjunction with the policy, require the Court to conclude that PSM must defend and indemnify CCD and the additional insureds in this case.

### A. Any Ambiguity in an Insurance Policy Must Be Construed Against the Insurer.

The interpretation of an insurance contract "is no different from the interpretation of any other contract, and [the Court] must construe the words of the policy in their usual and ordinary sense." *Boston Gas Co. v. Century Indem. Co.*, 454 Mass. 337, 355 (2009) (quotation omitted). However, when "there is more than one rational interpretation of policy language," the policy is ambiguous. *Hakim v. Mass. Insurers' Insolvency Fund*, 424 Mass. 275, 281 (1997). Any ambiguity in a policy must be resolved in favor of the insured and for coverage. *See Scottsdale Ins. Co. v. Torres*, 561 F.3d 74, 77 (1st Cir. 2009); *Crestview Country Club, Inc. v. St. Paul Guardian Ins. Co.*, 321 F. Supp. 2d 260, 263 (D. Mass. 2004).

### B. Exclusions Must Be Construed Narrowly and in Favor of Coverage.

Similarly, any exclusion in an insurance policy must be construed narrowly, so as to provide the insured with coverage whenever an exclusion could reasonably be interpreted in such a way as to provide coverage. *See Stop & Shop Cos. v. Fed. Ins. Co.*, 136 F.3d 71, 73 (1998) ("Exclusionary clauses must state clearly what items are to be excluded and any ambiguity is to be interpreted strictly in the insured's favor.") (quotation omitted); *Mt. Airy Ins. Co. v. Greenbaum*, 127 F.3d 15, 19 (1st Cir. 1997); *Hakim*, 424 Mass. at 281.

### C. Specific Language Controls over General Language.

General language in a policy must yield to specific language. *See Central Int'l Co. v. Kemper Nat'l Ins. Cos.*, 202 F.3d 372, 374 (1st Cir. 2000) (citing Restatement (2d) Contracts § 203(c)); *BP Chemicals, Inc. v. First State Ins. Co.*, 226 F.3d 420, 426-427 (6th Cir. 2000). "Under Massachusetts law, it is well settled that in choosing between two conflicting or inconsistent clauses, the more limited and specific clause prevails over the more encompassing and general clause such that the latter operates as a modification of the

former." *Noonan v. Wonderland Greyhound Park Realty LLC*, 723 F. Supp. 2d 298, 331-332 (D. Mass. 2010).

### D. An Insurance Policy Must Be Interpreted to Give Effect to the Intention of the Parties.

The Court must favor the interpretation of the policy that best effects the intention of the parties. *See Ayer v. Imperial Cas. & Indem. Co.*, 418 Mass. 71, 73 (1994) ("The favored interpretation of an insurance policy is one which best effectuates the main manifested design of the parties.") (quotation omitted); *Met. Prop. & Cas. Ins. Co. v. Fitchburg Mut. Ins. Co.*, 58 Mass. App. Ct. 818, 823 (2003) ("[I]t is a long-standing rule of construction that the favored interpretation of an insurance policy is one which best effectuates the main manifested design of the parties.") (quotation omitted).

## III. THE PRIMARY POLICY COVERS CCD AND THE ADDITIONAL INSUREDS.

PSM must defend and indemnify CCD as well as CCD's additional insureds, Donut II, Dunkin' Brands, and McCarthy Management, all of whom have been named as defendants in Mr. Arteaga's lawsuits. In return for premium payments from CCD, PSM undertook an affirmative obligation to CCD and these additional insureds to provide coverage for exactly this kind of situation, where someone (here, a CCD employee) sustained bodily injury on the premises and sued one of the additional insureds. There is no question that the policies are intended to provide coverage for bodily injury on the premises and that PSM also affirmatively agreed to provide insurance for liability that CCD assumed through the Lease and the Franchise Agreement – which are defined as "insured contracts" in the Primary Policy. The coverage exclusions that PSM relies on do not apply and do not limit PSM's affirmative obligation to provide insurance sufficient to cover CCD's "insured contracts."

PSM's attempt to shirk its insurance obligations when faced with a catastrophic claim is improper and constitutes bad faith insurance practices.

**A.    The Primary Policy Provides Coverage to CCD and the Additional Insureds.**

**1.    The Plain Terms of the Primary Policy Provide Coverage to CCD and the Additional Insureds for Accidental Bodily Injuries.**

CCD can easily meet its burden to prove that the Primary Policy covers the claims raised in Mr. Arteaga's lawsuits. *See Markline Co. v. Travelers Ins. Co.*, 384 Mass. 139, 140 (1981); *Camp Dresser & McKee, Inc. v. Home Ins. Co.*, 30 Mass. App. Ct. 318, 321 (1991). Under the Primary Policy, PSM agreed that it "will pay any amounts up to your [CCD's] Limit of Coverage for which you or anyone else covered under your *Liability Coverages* becomes liable as a result of 'bodily injury' . . . that is caused by an accident." PSM Ex. 4 at 39. This language is clear: PSM has agreed to insure CCD and "anyone else covered" under the policy (the additional insureds) for liability resulting from accidental bodily injury. PSM does not, and cannot, deny that this language obligates it to provide coverage for Mr. Arteaga's claims resulting from the injuries he sustained in the accident on December 4, 2007. There is also no dispute that Donut II, Dunkin' Brands, and McCarthy Management are all expressly named as additional insureds, and therefore they are covered under the policy for accidental bodily injuries. *See* PSM Ex. 4 at 6, 7 (the coverage data pages naming Donut II, Dunkin' Brands, and McCarthy Management), 64, 65 (the endorsements providing insurance coverage). What PSM argues is that several exclusions apply and, therefore, it has no obligation to provide coverage for one of the most foreseeable types of claims for which insurance was purchased – an accident on the premises that resulted in bodily injury. PSM's interpretation of its own policy is incorrect, contrary to the plain meaning of the policy, inconsistent with applicable Massachusetts law, and utterly self-serving.

### 2. The Insured Contract Provision Covers Donut II and Dunkin' Brands for Accidental Bodily Injuries.

PSM also affirmatively agreed to provide insurance to cover liability assumed by CCD in its "insured contracts," including the Lease and the Franchise Agreement. Specifically, PSM agreed that it "will cover liability assumed in a contract or agreement that is an 'insured contract.'" PSM Ex. 4 at 41. An "insured contract" includes "a lease of premises" and "that part of any other contract or agreement pertaining to your [CCD's] business under which you [CCD] assume the tort liability of another to pay damages because of 'bodily injury' or 'property damage' to a third person or organization, or if the contract or agreement is made prior to the 'bodily injury' or 'property damage.' Tort liability means a liability that would be imposed by law in the absence of any contract or agreement."[3] PSM Ex. 4 at 41-42.

CCD entered into a valid lease with Donut II ("Lease") that required CCD to obtain:

> an insurance policy or policies protecting the Lessee [CCD] and the Lessor [Donut II] and their directors and employees against any loss, liability or expense whatsoever from (without limitation) fire, personal injury, theft, death, property damage or otherwise arising or occurring upon or in connection with the Premises or by reason of the Lessee's [CCD] operation or occupancy of the Premises. Such policy or policies shall include comprehensive general liability insurance, including, but not limited to, product and contractual liability coverages, with a single limit of Five Million Dollars ($5,000,000.00) for bodily injury and property damage combined, all risk property damage insurance, including flood and earthquake protection, for the full replacement cost value of the Premises, plate glass insurance and boiler insurance as may be required in the Commonwealth of Massachusetts. (Lease § 12(c)).

Based on the Primary Policy's definition of "insured contract," the Lease is an insured contract, and PSM must cover all liability for personal injury caused by an accident that CCD

---

[3]     This policy language is taken verbatim from the 1986 Insurance Services Office standard comprehensive general liability policy, Form CG 00 02 02 86. *See* John N. Bolus, "Contractual Liability Insurance Provisions: An Overview," *in Reference Handbook on the Comprehensive General Liability Policy* 33 (Peter J. Neeson, ed. 1995) (hereinafter "Bolus").

Insured contracts are a long-standing and accepted means of protecting against known or anticipated business risks, including bodily injury to the named insured's employees. *See id*. at 27, 33.

has assumed under the Lease, limited only by the coverage limits of the policies, which here are $5 million for bodily injury.[4]

Similarly, CCD had a franchise agreement with Dunkin' Brands ("Franchise Agreement"). The Franchise Agreement required that CCD obtain:

> an insurance policy or policies protecting FRANCHISEE [CCD] and DUNKIN' DONUTS, and their directors and employees against any loss, liability or expense whatsoever from, without limitation, fire, personal injury, theft, death, property damage or otherwise arising or occurring upon or in connection with the CPL [the leased premises] or by reason of FRANCHISEE's [CCD] operation or occupancy of the CPL. Such policy or policies shall include comprehensive general liability insurance, including but not limited to, product, contractual, and owned and non-owned vehicle liability coverages, with a single limit of One Million Dollars ($1,000,000.00) (or such higher limit as DUNKIN' DONUTS, in its sole and absolute discretion, may from time to time require, and as may be required under the terms of any lease for the CPL) for bodily injury and property damage combined, "All Risk" property damage insurance, including without limitation flood and earthquake protection, for the full replacement cost value of the CPL and the contents thereof, plate glass insurance and boiler insurance, if applicable, and such statutory insurance as may be required in the state in which the CPL is located. (Franchise Agreement § 5.3).

Again, pursuant to the policy's definition of "insured contract," the Franchise Agreement is an insured contract, and PSM must cover all liability for personal injury caused by an accident for which CCD has assumed liability in the Franchise Agreement, limited only by the coverage limits of the policy, which here are more than enough to meet CCD's obligation in the Franchise Agreement.

### B. No Exclusion Applies.

As the insurer, PSM has the burden to prove that some exclusion applies to contravene its express and affirmative grant of coverage. *See Ratner v. Canadian Universal Ins. Co.*, 359 Mass. 375, 381 (1971) (placing the burden "upon the party relying on such an exception"); *Camp Dresser & McKee*, 30 Mass. App. Ct. at 321 ("Once basic risk coverage is established,

---

[4] The Primary Policy provides $1 million in coverage for bodily injury, PSM Ex. 4 at 2, and the Umbrella Policy provides an additional $4 million for bodily injury. PSM Ex. 5 at 2.

the burden shifts to the insurer to prove the applicability of any exclusion to coverage set forth outside of the insuring clause."). As explained below, no exclusion applies, and PSM must defend and indemnify CCD, Donut II, Dunkin' Brands, and McCarthy Management, for all claims raised by Mr. Arteaga in the underlying lawsuits, up to the $5 million coverage limit.

## 1. The Intra-Insured Exclusion Does Not Apply.

The intra-insured exclusion provides that "[l]iability coverage . . . does not apply to Bodily Injury . . . sustained by you or any other insured . . . . We will have no duty to defend or indemnify any insured against a claim, suit or lawsuit by any other insured." (Intra-Insured Exclusion, Kossuth Aff. Ex. 8). PSM argues that the intra-insured exclusion precludes coverage here where one insured, Mr. Arteaga, has sued other insureds, Donut II, Dunkin' Brands and McCarthy Management, as a result of his severe bodily injury on the premises. PSM's position is contradicted by Massachusetts case law, a proper reading of the policy itself, and the insureds' clear intention that there would be coverage for the insureds to protect them in the event of this kind of tragic and catastrophic injury on the property.

### a. Case law undercuts PSM's argument.

In *Parker v. John Moriarty & Assocs.*, No. 05-0981, 2007 Mass. Super. LEXIS 325 (July 29, 2007) (PSM Ex. 8), which is squarely on point, the Massachusetts court found that a similar intra-insured exclusion did not preclude coverage in nearly identical circumstances in which the policyholder, a subcontractor, had agreed in writing to indemnify an additional insured and to purchase insurance coverage to satisfy that indemnification agreement to protect the additional insured from claims for bodily injury by the policyholder's employees. The *Parker* court found that if the intra-insured exclusion were applied it would eviscerate the purpose of the insurance that the policyholder paid for, namely, to protect itself and the additional insureds in the event of bodily injury claims for accidents on the construction site.

14

The court held that, as a matter of law, the insurer was liable to provide coverage for the additional insured, notwithstanding the conflicting intra-insured exclusion. As discussed more fully below, the facts and reasoning of *Parker* apply forcefully here and strongly indicate that PSM has a duty to provide coverage to CCD's additional insureds despite the intra-insured exclusion.

In *Parker*, the general contractor, Moriarty, subcontracted the fabrication and erection of steel for the construction of a building to Isaacson, which in turn subcontracted the erection to Stearns, which in turn used an affiliated company, Accord, to employ the ironworkers who performed the labor. *Id*. at *1. Parker was an employee of Accord and was injured on the job site. *Id*. The subcontract between Moriarty and Isaacson required Isaacson to indemnify Moriarty against "all claims, damages, losses, and expenses . . . attributable to bodily injury . . . ." *Id*. at *4. The subcontract also required Isaacson to name Moriarty as an additional insured. *Id*. at *5. The contract between Stearns and Isaacson required Stearns to be bound by all the terms and provisions of the contract between Moriarty and Isaacson. *Id*. at *6. The Stearns-Isaacson contract also included an express provision by which Stearns agreed to indemnify Moriarty "against all claims, costs, damages, losses, expenses or liabilities . . . attributable to bodily injury . . . ." *Id*. at *7. According to this contract, then, Stearns agreed to indemnify Moriarty for all personal injury claims arising out of Stearns's work, even if by Stearns's employees, or the employees of Accord, which was working at the direction of Stearns. *Id*. at *8-*9. In addition, as part of the contract between Isaacson and Stearns, Stearns agreed to add Moriarty as an additional insured to its liability policy. *Id*. at *9. Stearns carried a liability insurance policy with Evanston Insurance Company, which named Moriarty as an additional insured. *Id*. In the endorsement adding Moriarty, it gave the name of the additional insured, "AS PER WRITTEN CONTRACT," which referred to the

subcontracts by which Stearns agreed to add Moriarty as an additional insured.  *Id*. at *10-*11.  The certificate of insurance specifically named Moriarty.  *Id*. at *11.

Parker sued Moriarty, and Moriarty tendered its defense to Evanston, which refused to defend and indemnify it against Parker's claims.  *Id*. at *2-*3.  Moriarty then brought third-party complaints against Stearns and Evanston.  *Id*. at *2.  Evanston argued that it had no duty to defend or indemnify Moriarty because the policy's intra-insured exclusion precluded coverage for "any liability of one insured for 'bodily injury' . . . to . . . another insured."  *Id*. at *21.  The court determined that both Parker and Moriarty were "insureds" under the Evanston policy:  Parker, because he was an employee "act[ing] within the scope of [his] employment," and Moriarty because of the additional insured endorsement.  *Id*. at *22-*23.  As a result, the court reasoned that a strict reading of the exclusion would preclude coverage for Moriarty for Parker's claims.  *Id*. at *23.

However, the court found that that interpretation of the exclusion would defeat the intent of adding Moriarty as an additional insured, which had been done specifically to insure it against all claims and losses for personal injury arising out of the work performed by or for Stearns.  *Id*. at *23.  The court found that because the additional insured endorsement added Moriarty by reference to the "WRITTEN CONTRACT," i.e., the contract by which Stearns agreed to indemnify Moriarty and name it as an additional insured, it was clear that "the inclusion of coverage for such claims was at a minimum the intention and expectation of Moriarty, the insured seeking coverage."  *Id*. at *23-*24.  Furthermore, none of the underlying subcontracts limited the scope or extent of the indemnity in any way.  *Id*. at *24.  "Given the language of the policy and these subcontracts, Moriarty would reasonably have expected the insurance to cover claims by Stearns or Accord's employees, but not its own employees."  *Id*.  For that reason, the court held that the intra-insured exclusion could not preclude coverage for

Moriarty, because coverage for this type of claim was precisely why Moriarty was named as an additional insured in the first place. Because "exclusionary clauses must be strictly construed against the insurer so as not to defeat any intended coverage or diminish the protection purchased by the insured, . . . Parker's claims against Moriarty are not excluded from coverage under the cross-suits provision." *Id.* at *26 (citing *Vappi & Co. v. Aetna Cas. & Sur. Co.*, 348 Mass. 427, 431-32 (1965)).

Similarly, in *Twin City Fire Insurance Company v. Ohio Casualty Insurance Company*, 480 F.3d 1254 (11th Cir. 2007), in a situation like that in *Parker* and here, the Eleventh Circuit found that an intra-insured exclusion could not negate the very coverage that the named insured sought and was required to obtain pursuant to an insured contract. *Id.* at 1262. Reading the policy as a whole to determine the intent of the parties in obtaining the insurance, the Eleventh Circuit found the exclusion was ambiguous, "because the policy elsewhere expressly contemplates coverage of such obligations." *Id.* To find otherwise "would nullify the core of the additional insured coverage provision." *Id.* The insurer's interpretation would also result in denying the protection of the insured contract provision to anyone who is added as an additional insured, a result not contemplated by anything in the policy. *Id.* at 1263. Because the intra-insured exclusion must be narrowly construed, it did not preclude coverage under the insured contract provision. *Id.*

The facts here require the same result. CCD's Lease and Franchise Agreement required it to obtain coverage for and indemnify Donut II and Dunkin' Brands for all liabilities, including bodily injury to any person, including CCD employees, and to add them as additional insureds to the policy. *See* Lease § 12(c); Franchise Agreement § 5.3. PSM's reliance on the intra-insured exclusion would utterly defeat the sole purpose of adding Donut II and Dunkin' Brands as additional insureds to the policy, and frustrate CCD's intention to

provide insurance coverage to Donut II and Dunkin' Brands required by the Lease and the Franchise Agreement, thereby exposing CCD to cross-suits for indemnification. This is precisely the kind of exposure that CCD intended and expected to prevent when it purchased the insurance policies from PSM.

Parker and Twin City held that in the face of such a contradiction, the intention of the parties in obtaining the policy must control. Parker, 2007 Mass. Super. LEXIS 325, at *26; Twin City, 480 F.3d at 1263; see also Ayer, 418 Mass. at 73 ("The favored interpretation of an insurance policy is one which best effectuates the main manifested design of the parties."); Met. Prop. & Cas. Ins. Co., 58 Mass. App. Ct. at 823. PSM may not rely on the intra-insured exclusion to deny Donut II and Dunkin' Brands the very coverage that CCD was required to obtain for them, and did obtain by naming them as additional insureds. Doing so, despite the language of the Lease and the Franchise Agreement requiring such coverage, the status of Donut II and Dunkin' Brands as additional insureds, and the plain language of the insured contract provision, would defy the reasonable expectations of the parties and defeat CCD's intent in obtaining the policy.

If anything, the circumstances here line up even more forcefully in favor of coverage than in Parker because PSM expressly agreed to provide coverage where CCD, through "insured contracts," agreed to defend and indemnify third parties for liability for personal injury, and to provide agreed-upon amounts of insurance coverage. If the mere reference in the policy endorsement in Parker to the "WRITTEN CONTRACT" sufficed to establish the intention and expectation of the parties, then a fortiori an express and affirmative grant of coverage in the policy itself must establish that Donut II and Dunkin' Brands intended and reasonably expected to be covered for all bodily injury claims by CCD employees. See Parker, 2007 Mass. Super. LEXIS at *23-*24.

18

As in *Twin City*, the express language of the insured contract provision here affords coverage because the Lease and the Franchise Agreement expressly promise to provide Donut II and Dunkin' Brands with defense and indemnification coverage for any claims arising out of CCD's use of the leased premises, which conflicts with the intra-insured exclusion, rendering it at the very least ambiguous and requiring the Court to find that it does not apply and that there is coverage.

  b. None of the usual purposes of the intra-insured exclusion is served <u>by applying it here.</u>

The intra-insured exclusion is also inapplicable here because its primary purpose is to prevent collusive or fraudulent suits. *See, e.g.*, *Am. Cas. Co. v. Sentry Fed. Sav. Bank*, 867 F. Supp. 50, 59-60 (D. Mass. 2004) ("[T]he obvious intent behind the 'insured v. insured' exclusion is to protect [the insurer] from collusive suits among [the company] and its directors and officers.") (quotation omitted). There clearly has been no collusion or fraud here where Mr. Arteaga, without dispute, suffered catastrophic injuries in an accident. Where there is no collusion, nor even risk of collusion, the intra-insured exclusion should not be enforced. *See Stratton v. Nat'l Union Fire Ins. Co.*, No. 03-CV-12018, 2004 U.S. Dist. LEXIS 17613, at *18-*19 (D. Mass. Sept. 3, 2004) (refusing to enforce an intra-insured exclusion when there was no risk of collusion between the insured parties).

The intra-insured exclusion is also designed "to avoid duplication of coverage with an employer's workers' compensation and employers' liability coverage." Donald S. Malecki, et al., *The Additional Insured Book* 139 (5th ed. 2004). When, as here, an employee of the named insured brings suit against additional insureds, neither worker's compensation nor the employer's liability is implicated, because the additional insured (e.g., Donut II) would not be

liable for either.  In this circumstance, the intra-insured exclusion has no applicability to the

employee's claims against the additional insured.  *See id*. at 140.[5]

          c.   PSM's reading of the policy language is strained and would eviscerate
               PSM's obligation to cover CCD's "insured contracts."

PSM argues that the language in the Lease and the Franchise Agreement does not

"expressly agree" to indemnify Donut II and Dunkin' Brands for the injuries sustained by its

employees.  PSM Mem. at 29.  However, that argument does not withstand scrutiny because

neither the Lease nor the Franchise Agreement limit themselves to injuries by employees;

rather, they require coverage for "***any loss, liability or expense whatsoever*** from, without

limitation, fire, personal injury, theft, death, property damage or otherwise arising or

occurring upon or in connection with the" the property.  Lease § 12(c); Franchise Agreement

§ 5.3 (emphasis added).  Nor does the insured contract provision limit the scope of liability

coverage to particular instances or persons.  PSM Ex. 4 at 41-42.  PSM cannot successfully

contend that because the word "employee" does not appear in this clause that neither Donut II

nor Dunkin' Brands intended the required insurance to include injuries to CCD employees

when the Lease and the Franchise Agreement themselves as well as the insured contract

provision use broader language that encompasses CCD employees.

Even if the language were ambiguous, and it is not, the ambiguity would have to be

resolved in favor of the insured and for coverage.  *See Scottsdale Ins. Co. v. Torres*, 561 F.3d

74, 77 (1st Cir. 2009); *Crestview Country Club, Inc. v. St. Paul Guardian Ins. Co*., 321 F.

---

[5]      This is true because, pursuant to the separability of the insureds clause, the policy applies separately to each insured against whom a suit is brought.  *Id*.; *see* PSM Ex. 4 at 39 ("Your Liability Coverages apply separately to each covered person or organization, except for the Limit of Coverage.  The Limit of Coverage does not apply separately to each covered person or organization; it applies to all of them together.").  As in *Parker*, the implication of a separation of insureds clause here is that in a suit between insureds, each insured's coverage is considered individually.  *See Worcester Mut. Ins. Co. v. Marnell*, 398 Mass. 240, 244 (1986) (finding that the separation of insureds clause "requires that each insured be treated as having a separate insurance policy.  Thus, the term 'insured' as used in the . . . exclusion refers only to the person claiming coverage under the policy."); *see also* Malecki at 140 ("[A]dditional insureds are covered when they are liable for injuries to the employees of other insureds.").

Supp. 2d 260, 263 (D. Mass. 2004).  Based on settled law in Massachusetts, an exclusion

from insurance coverage must be construed narrowly, so as to provide the insured with

coverage whenever an exclusion can reasonably be interpreted in such a way as to provide

coverage.  *See Stop & Shop Cos*., 136 F.3d at 73; *Mt. Airy Ins. Co*., 127 F.3d at 19; *Hakim*,

424 Mass. at 281.

        d.  PSM only cites cases from other jurisdictions,
            and those cases are distinguishable.

In support of its argument that the intra-insured exclusion precludes coverage here,

PSM cites only cases from other jurisdictions which are not controlling.  Even if they were,

they are all readily distinguishable because none of the cases cited addresses the crucial issue

in this case, which is the insured contract provision that affords coverage to both Donut II and

Dunkin' Brands.  *See* PSM Mem. at 24-27.

PSM also cites a federal district court case from Arizona, which in fact supports

CCD's position.  In *Morgan v. American Family Mutual Insurance Company*, No. CV 06-

1136-PHX-JAT, 2007 U.S. Dist. LEXIS 41172 (D. Ariz. June 6, 2007), the court relied on

Ninth Circuit precedent and held that "the doctrine of reasonable expectations renders the

Policy's intra-insured exclusion unenforceable."  *Id.* at *3 (citing *State Farm Mut. Auto. Ins.

Co. v. Falness*, 39 F.3d 966 (9th Cir. 1994)).[6]  This is consistent with the *Parker* and *Twin

City* decisions.

Therefore, for the reasons stated in *Parker*, *Twin City*, and *Morgan*, the intra-insured

exclusion cannot, as a matter of law, supplant PSM's express grant of coverage to CCD,

Donut II, and Dunkin' Brands through the insured contract provision.  Nor can the intra-

---

[6]    *See* PSM Mem. at 16 (citing *Morgan* for the proposition that the court there "enforce[ed an] intra-insured exclusion").  Furthermore, the Ninth Circuit affirmed the district court, holding that the doctrine of reasonable expectations rendered policy's intra-insured exclusion unenforceable, because "[w]here . . . one section would lead a reasonably intelligent person to conclude that he is covered under the policy, but another section inconspicuously eviscerates that coverage, the section limiting the coverage is invalid."  *Morgan v. Am. Family Mut. Ins. Co*., 336 Fed. Appx. 644, 645, 2009 U.S. App. LEXIS 13120, *3 (9th Cir. 2009).

insured exclusion nullify the parties' reasonable expectations of coverage based on the "insured contract" provision and their contracts (the Lease and the Franchise Agreement) which plainly contemplate that there will be appropriate insurance coverage for the kind of bodily injury claim that Mr. Arteaga has brought. PSM has not carried its burden to establish that the intra-insured exclusion precludes coverage here.

e.     Alternatively, a disputed issue of material fact precludes
entry of summary judgment.

However, if this Court finds that the intra-insured exclusion may apply (and it should not), this Court still cannot grant summary judgment in favor of PSM because there is a genuine dispute of material fact concerning whether Mr. Arteaga was "acting within the scope of [his] duties" at the time of the accident. *See* PSM Ex. 4 at 39; Couto Aff. ¶¶ 6-13 (describing the scope of Mr. Arteaga's duties).

The Primary Policy applies to the named insured, CCD, and "certain other people," including "employees who are acting within the scope of their duties." PSM Ex. 4 at 38-39. Despite PSM's statement that it is "uncontroverted" that Mr. Arteaga was "acting within the scope of [his] duties,"[7] PSM has not supported that allegation and, in fact, Mr. Arteaga was not acting within the scope of his duties when the accident occurred. *See* Couto Aff. ¶¶ 6-13. Thus, he is not an "insured" under the policy, his suits against CCD and the additional insureds are not between insured parties, and the intra-insured exclusion does not apply. *See* PSM Ex. 4 at 38-39.

Whether an employee is acting "within the scope of his duties" is a factual question that requires the analysis of several factors, which are stated in the Restatement (2nd) of

---

[7]      Mr. Arteaga filed his most recent complaint on December 6, 2010, but did not serve it. He filed an amended complaint on or about February 28, 2011, and, on information and belief, only two defendants have answered the complaint, and each has denied Mr. Arteaga's allegations. Three other defendants have served motions to dismiss.

Agency, § 229(b). Applying those factors to this case, Mr. Arteaga was not acting within the scope of his duties at the time of the accident. For example, Mr. Arteaga was the production manager responsible for baking products for sale in Dunkin' Donuts stores. Whenever there was a problem with ventilation, as there was the night of the accident, he was not responsible for climbing to the roof to examine and repair the ventilation system – that was the job of the repair company that had been called, Couto Aff. ¶¶ 7-8, and it was not an "act commonly done by such servants" as the production manager. Rest. (2d) Agency § 229(b)(1). Nor was Mr. Arteaga supposed to go to the roof, at night, for any repairs, Couto Aff. ¶¶ 7-8, and thus "the time, place and purpose of the act" was outside the scope of his duties. Rest. (2d) Agency § 229(b)(2). Mr. Arteaga was neither supposed to nor expected to accompany the repairman to the roof. Couto Aff. ¶¶ 7-8; Rest. (2d) Agency § 229(b)(3) ("whether or not the master has reason to expect that such an act will be done"). PSM has adduced no admissible evidence that Mr. Arteaga was "acting within the scope of [his] duties" at the time of the accident, and therefore this Court cannot find that he was an "insured" for the purposes of his claims against CCD and the additional insureds.

### 2. The Bodily Injury to Employees Exclusion Does Not Apply.

The bodily injury to employees provision also does not exclude coverage here. While this provision states that PSM "will not cover . . . your [CCD's] liability for the 'bodily injury' as an employer or in any other capacity . . .," it specifically carves out an exception for insured contracts, providing that PSM "will cover liability that you [CCD] or anyone else covered under your *Liability Coverage's* [*sic*] assumes under an 'insured contract' that is covered by this policy." PSM Ex. 4 at 44.[8] The significance of this exception to the standard

---

[8] This exception comes from the standard CGL form promulgated by the Insurance Services Office, and is intended specifically to allow the third parties with these "insured contracts" to be covered for bodily injuries to the named insured's employees. *See* Bolus at 32-33.

exclusion is that an insured has coverage for an employee's injuries when the coverage is sought for indemnification of another arising out of an insured contract. *See* Bolus at 41. Thus, PSM is expressly and affirmatively obligated to "cover liability . . . assume[d] under an 'insured contract,'" and as discussed above, CCD, in its insured contracts, assumed responsibility for "***any*** loss, liability or expense whatsoever," including liability arising from bodily injury. Lease § 12(c); Franchise Agreement § 5.3 (emphasis added). Accordingly, by the plain terms of the policy, PSM is required to cover CCD for the liability it assumed in its insured contracts.

This reading of the bodily injury to employees provision is also consistent with settled rules for interpreting insurance contracts in Massachusetts. Because the broad language of the employee bodily injury exclusion conflicts with the narrow language of the "insured contract" sentence in that same provision, the more specific language prevails, and PSM must cover the liability CCD assumed under the insured contracts. *See Central Int'l Co*., 202 F.3d at 374 (citing Restatement (2d) Contracts § 203(c)); *BP Chemicals, Inc*., 226 F.3d at 426-427 ("Each part of the contract should be given effect and more specific provisions control over general ones.") (citing 3 Arthur L. Corbin, Contracts § 545-54 (1960)); *Noonan*, 723 F. Supp. 2d at 331-332 ("Under Massachusetts law, it is well settled that in choosing between two conflicting or inconsistent clauses, the more limited and specific clause prevails over the more encompassing and general clause such that the latter operates as a modification of the former."), and cases cited. Exclusions are also to be strictly construed against the insurer and in favor of coverage. *See Stop & Shop Cos*., 136 F.3d at 73; *Mt. Airy Ins. Co*., 127 F.3d at 19; *Hakim*, 424 Mass. at 281.

The holding in *Great Southwest Fire Insurance Co. v. Hercules Building & Wrecking Co*., 35 Mass. App. Ct. 298 (1993), which PSM relies on, does not support enforcement of an

exclusion under these circumstances. There the court found that there **was** coverage under the policy for common-law claims against third parties, which is what Mr. Arteaga has asserted against Donut II, Dunkin' Brands, and McCarthy Management, even if there is none for the employer. *See id.* at 306-307. Those common-law claims against potentially responsible third parties are not excluded by the bodily injury exclusion for the employer. That is especially true where, as here, the policy employs language that specifically, affirmatively, and expressly provides coverage for liability assumed under insured contracts with those third parties.[9]

Therefore, the insured contract provision of the contract provides coverage to CCD and the additional insureds by a plain and proper reading of the Primary Policy, and the bodily injury exclusion does not apply to bar coverage to the additional insureds.

### 3.     The Workers' Compensation Exclusion Does Not Apply.

PSM's interpretation of the workers' compensation exclusion has nothing to do with the claims in the lawsuit and does not bar coverage. The exclusion states that PSM "will not cover any obligation for which you [CCD] or anyone else covered under your *Liability Coverages* or any of your insurers are liable under any workers' compensation, unemployment compensation, disability benefits, or other similar laws." PSM Ex. 4 at 44. The plain language of this exclusion simply states that PSM will not be responsible for paying Mr. Arteaga's workers' compensation benefits, or any other benefits mandated by statute. The exclusion does not refer to – and therefore cannot contravene – PSM's express promise to pay liability incurred in a civil tort action as a result of an injury that results in payment of workers' compensation. There is nothing in this exclusion (or anywhere else in the policy)

---

[9]     PSM's reliance on *Interco* is similarly misplaced. In *Interco*, the exclusion applied to injuries resulting from "offenses" relating to employment, such as retaliation and discrimination. *See Interco, Inc. v. Mission Ins. Co.*, 808 F.2d 682, 684 (8th Cir. 1987). That exclusion has nothing to do with the bodily injury exclusion here or the facts of this case.

25

that "explicitly precludes coverage for claims arising out of injuries for which an employee would be entitled to workers' compensation." PSM Mem. at 14-15. Nor does the exclusion "explicitly state[] that coverage is barred where [CCD] and/or [PSM] is liable under a workers' compensation law." *Id*. at 15-16. The exclusion only excludes the workers' compensation payments themselves, and not any potential civil liability assumed in an insured contract with a third party additional insured.

This reading of the workers' compensation exclusion is consistent with the statute itself which expressly provides that a recipient of workers' compensation benefits "may also bring a tort action against responsible third parties." *Gaeta v. Nat'l Fire Ins. Co. of Hartford*, 410 Mass. 592, 593 (1991) (citing M.G.L. c. 152, § 15). Mr. Arteaga has done just that, and the workers' compensation exclusion does not bar such claims. In *Great Southwest*, for example, the injured employee brought claims against both his employer ("Hercules") and its owner ("Monsini"), who was a "person insured" as that term was defined in Hercules' policy. *Great S.W.*, 35 Mass. App. Ct. at 302. The court found that although the policy's workers' compensation exclusion precluded coverage for claims against Hercules, there was coverage for Monsini, because his duties to the employee to maintain a safe workplace derived from common law rather than statute. *Id*. at 306; *see also Cowan Sys. v. Harleysville Mut. Ins. Co.*, 457 F.3d 368, 374(4th Cir. 2006) (holding that the workers' compensation exclusion only applies when the injured employee seeks workers' compensation (or other statutory compensation) from the named insured or additional insured, but not when the injured employee makes common-law claims against an additional insured).

Similarly, in this case, Mr. Arteaga's claims against Donut II, Dunkin' Brands, and McCarthy Management sound in common law, rather than statute. Therefore, the workers' compensation exclusion does not bar coverage for Mr. Arteaga's claims against them. This is

particularly true because the general language of the workers' compensation exclusion does not contravene the specific and express language of the insured contract provision, which provides coverage for liability for any bodily injury. *See, e.g.*, *Stop & Shop Cos*., 136 F.3d at 73 (construing exclusions narrowly); *Ayer*, 418 Mass. at 73 (interpreting an insurance policy to effectuate the intent of the parties).

        C.      **Endorsements FB3407 and FB3590 Expand Rather Than Restrict Coverage.**

Contrary to PSM's argument, Endorsement 3407, "Liability Coverage for Additional Persons and Organizations," "*expands*" the coverage of the policy to include Donut II, Dunkin' Brands, and McCarthy Management. PSM Ex. 4. at 64 (emphasis added). "[A]ll other terms of your [CCD's] policy apply to this amendment." *Id*. Because the Primary Policy specifically covers Donut II and Dunkin' Brands under the insured contract provision, and nothing in this endorsement is to the contrary, this endorsement does not preclude coverage to those additional insureds for Mr. Arteaga's claims.

Similarly, Endorsement 3590, "Additional Coverage for Grantor or Franchise," "*expands*" the coverage of the policy to include Dunkin' Brands. PSM Ex. 4 at 65 (emphasis added). Again, because "all other terms of your [CCD's] policy apply to this amendment," the Primary Policy specifically covers Dunkin' Brands under the insured contract provision, and nothing in this endorsement is to the contrary, this endorsement does not preclude coverage to Dunkin' Brands for Mr. Arteaga's claims.

**IV.**     **THE UMBRELLA POLICY LIKEWISE COVERS CCD AND THE ADDITIONAL INSUREDS.**

Similar to the reasons stated above under the Primary Policy, PSM owes a duty to defend and indemnify CCD and the additional insureds under the Umbrella Policy as well.

### A. The Umbrella Policy Covers the Coverage Claims Made by CCD.

The Umbrella Policy applies and PSM will "pay on behalf of the insured the ultimate net loss for occurrence during the policy period in excess of the underlying insurance or for occurrences by this policy which are either excluded or not covered by underlying insurance because of Personal Injury, Property Damage, or Advertising Liability anywhere in the world." PSM Ex. 5 at 8. To the extent that the damages claimed by Mr. Arteaga exceed CCD's policy limits under the Primary Policy, therefore, the Umbrella Policy provides excess coverage, unless some exclusion applies. For the reasons explained above, none of the exclusions relied on by PSM applies.

### B. The Intra-Insured Exclusion Does Not Apply.

The intra-insured exclusion in the Umbrella Policy, PSM 6001, has language identical to the intra-insured exclusion in the Primary Policy. PSM Ex. 5 at 15. The same analysis applies to both exclusions, therefore, and the Umbrella Policy's intra-insured exclusion does not preclude coverage for CCD or any additional insured. *See supra* at 13-22.

### C. The Employer's Liability Exclusion Does Not Apply.

The employer's liability exclusion, CU 2063, "shall not apply to liability assumed by the insured under a written contract if such liability is covered by valid and collectible Underlying Insurance . . . ." PSM Ex. 5 at 14. As discussed above, CCD assumed liability for both Donut II and Dunkin' Brands pursuant to the Lease and Franchise Agreement, respectively. Therefore, the Primary Policy covers Donut II and Dunkin' Brands because of their respective insured contracts with CCD, and the Umbrella Policy likewise covers Donut II and Dunkin' Brands. *See supra* at 11-13.

## V.   **PSM'S DUTY TO DEFEND IS TRIGGERED BY THE COMPLAINT.**

The Court should find that PSM is not entitled to summary judgment and is obligated to indemnify CCD and the additional insureds.  If the Court cannot so find at this stage, the Court should at the very least find that PSM has a duty to defend, which it owes to CCD and the additional insureds, and should not grant summary judgment in favor of PSM and should require that PSM provide a defense.

An insurer has a duty to defend its insured that is broader than its duty to indemnify.

> [T]he question of the initial duty of a liability insurer to defend third-party actions against the insured is decided by matching the third-party complaint with the policy provisions: if the allegations of the complaint are reasonably susceptible of an interpretation that they state or adumbrate a claim covered by the policy terms, the insurer must undertake the defense.  Otherwise stated, the process is one of envisaging what kinds of losses may be proved as lying within the range of the allegations of the complaint, and then seeing whether any such loss fits the expectation of protective insurance reasonably generated by the terms of the policy.

*Continental Cas. Co. v. Gilbane Bldg. Co*., 391 Mass. 143, 146-147 (1984) (quotation and citations omitted).  In this case, Mr. Arteaga first filed a "complaint for discovery" that suggested that one or more of the defendants in this action may be liable in tort for his injuries, but he was seeking discovery to determine who may be liable.  Mr. Arteaga's first complaint against CCD and the additional insureds is, on its face, "reasonably susceptible of an interpretation" that CCD's liability policy terms cover this injury, and PSM had an obligation to defend CCD and the additional insureds, which PSM breached.

After the Superior Court dismissed Mr. Arteaga's First Lawsuit, he filed the Second Lawsuit in December 2010, again naming Donut II, Dunkin' Brands, and McCarthy Management, among others, as defendants.[10]  The Second Lawsuit alleges that certain defendants, including the additional insureds under CCD's policy, are liable in tort for Mr.

---

[10]   Because of the workers' compensation bar, Mr. Arteaga could not file suit against CCD, and CCD is not a defendant in the Second Lawsuit.

Arteaga's injuries. Mr. Arteaga's tort claims arise out of his bodily injury and are therefore "reasonably susceptible" of an interpretation that PSM must defend CCD and the additional insureds based on the plain language that PSM "will pay any amounts up to your Limit of Coverage for which you [CDD] or anyone else covered under you *Liability Coverages* becomes liable as a result of 'bodily injury' . . . that is caused by accident." PSM Ex. 4 at 39. PSM must therefore defend the additional insureds for all claims against them. *See Liberty Mut. Ins. Co. v. Met. Life Ins. Co.*, 260 F.3d 54, 63 (1st Cir. 2001) ("[A]n insurer must defend the entire lawsuit if it has a duty to defend any of the underlying counts in the complaint.") (citing *Mt. Airy Ins. Co.*, 127 F.3d at 19).

## VI. PSM'S FAILURE TO DEFEND CCD AND THE ADDITIONAL INSUREDS IS A BREACH OF CONTRACT AND THE COVENANT OF GOOD FAITH AND FAIR DEALING.

### A. PSM Has Breached Its Contract with CCD.

The insurance policies are valid contracts between PSM and CCD. *See Dodd v. Commercial Union Ins. Co.*, 373 Mass. 72, 81 (1977). In exchange for premiums received, PSM agreed to provide certain coverage, including defense and indemnification of CCD and additional insureds for accidental bodily injury, pursuant to the terms of the policies. The plain terms of the Primary Policy require that PSM defend and indemnify CCD and the additional insureds against Mr. Arteaga's claims. PSM's refusal to do so here is a breach of its contract with CCD, which has caused CCD damages, including but not limited to the cost of this and the underlying suit.

### B. PSM Has Breached the Covenant of Good Faith and Fair Dealing.

Every contract, including insurance policies, includes an implied covenant of good faith and fair dealing. *See DiMarzo v. American Mut. Ins. Co.*, 389 Mass. 85, 97 (1983); *Murach v. Mass. Bonding & Ins. Co.*, 339 Mass. 184, 186-187 (1959) (an insurer has an

"obligation . . . to act in good faith"); *Thaler v. Am. Ins. Co.*, 34 Mass. App. Ct. 639 (1993) (citing *DiMarzo* and *Marach* for the proposition that "implicit in every contract between an insurer and insured is a covenant of good faith and fair dealing."). That covenant requires, "that neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 471 (1993). PSM has breached that covenant here by refusing to defend and indemnify CCD and the additional insureds for a claim expressly covered by the plain terms of the policies. That breach has caused damages to CCD and the additional insureds, including but not limited to the cost of this and the underlying suit.

## VII. PSM'S FAILURE TO DEFEND AND INDEMNIFY CCD AND THE ADDITIONAL INSUREDS CONSTITUTES UNFAIR AND DECEPTIVE INSURANCE PRACTICES.

Chapter 176D of the Massachusetts General Laws prohibits "unfair claim settlement practices," which includes, among other things, "[f]ailing to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear." M.G.L. c. 176D, § 3(9)(f). By definition, "unfair claim settlement practices" are "unfair methods of competition and unfair or deceptive acts or practices in the business of insurance," which violate c. 93A, § 2. *See* M.G.L. c. 176D, § 3; c. 93A, § 2. Under c. 93A, § 11, CCD may recover up to treble damages and attorneys' fees as a result of any damages suffered as a result of another's "unfair or deceptive act or practice declared unlawful by section two."

PSM has refused to defend and indemnify CCD and the additional insureds when it was "reasonably clear" that it could be liable to CCD, which violates c. 176D. The "reasonably clear" test is an "objective test [that] calls upon the fact finder to determine whether a reasonable person, with knowledge of the relevant facts and law, would probably have concluded, for good reason, that the insurer was liable to the plaintiff." *Demeo v. State*

*Farm Mut. Auto. Ins. Co.*, 38 Mass. App. Ct. 955, 956-957 (1995). In this case, no reasonable

person, reading the policies in light of the intention of the parties in obtaining those policies,

the allegations of Mr. Arteaga's underlying complaint, and applicable Massachusetts law,

could have interpreted the policies to find that there is no coverage for an accident to an

employee on the premises that caused catastrophic bodily injury. The insured contract

provision was intended to, and does, cover precisely this situation. *See supra* at 11-13. No

exclusion in the policy applies, because to exclude coverage in this case, for this type of

injury, would render the policy a nullity. It is unreasonable, therefore, and a violation of c.

176D, for PSM to have taken the self-serving position that general, non-specific exclusions

trump the affirmative and specific grants of coverage in the insured contract provision. *See*

*supra* at 13-22. CCD is therefore entitled to recover, at the very least, its expenses and

attorneys' fees in this suit. *See John T. Callahan & Sons, Inc. v. Worcester Ins. Co.*, 453

Mass. 447, 447 (2009) ("It is well settled that an insured is entitled to recover reasonable

attorney's fees and expenses incurred in successfully establishing the insurer's duty to defend

under the terms of the policy.").

In addition, because PSM's c. 176D violation has forced CCD "to incur legal fees and

expenses that are not simply those incurred in vindicating [CCD's] rights under the statute,

those fees may be treated as actual damages in the same way as other losses of money or

property." *Siegel v. Berkshire Life Ins. Co.*, 64 Mass. App. Ct. 698, 703 (2005). In other

words, all attorneys' fees, both those incurred in the underlying lawsuit because of the

insurer's unfair and deceptive practices and those incurred in this suit, are recoverable as

damages. *Id*. Because these damages constitute actual damages, they may be multiplied. *See*

*Columbia Chiropractic Group, Inc. v. Trust Ins. Co.*, 430 Mass. 60, 63 (1999).

**CONCLUSION**

For all of the above reasons, this Court must deny Plaintiff's motion for summary judgment. In addition, for all the reasons stated above and in CCD's cross-motion for summary judgment, this Court must grant CCD's cross-motion for summary judgment and find that Plaintiff has a duty to defend and indemnify CCD and the additional insureds in the underlying matter and award CCD its damages, trebled, and its reasonable attorneys' fees in both underlying suits and in this suit.

Respectfully submitted,

CAPE COD DISTRIBUTORS, INC.,

By its attorneys,

/s/ James Kossuth
Howard M. Cooper (BBO# 543842)
Nicholas B. Carter (BBO# 561147)
James Kossuth (BBO# 668005)
TODD & WELD LLP
28 State Street, 31st floor
Boston, MA 02108
617-720-2626
jkossuth@toddweld.com

Dated: April 4, 2011

**CERTIFICATE OF SERVICE**

I, James Kossuth, hereby certify that this document has been filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this date.

/s/ James Kossuth
James Kossuth